UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

   -v.-                                              :          09 Cr. 991 (JSR)

ROOMY KHAN,                                  :          **REDACTED**

              Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S SUBMISSION
# PURSUANT TO SECTION 5K1.1 OF THE GUIDELINES

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
   of America.

CHRISTOPHER LAVIGNE
JILLIAN BERMAN
Assistant United States Attorneys
   - Of Counsel -



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 24, 2013

**BY HAND**

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

    Re: *United States v. Roomy Khan,*
        09 Cr. 991 (JSR)

Dear Judge Rakoff:

    The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that defendant Roomy Khan has rendered in the investigation and prosecution of other persons. For the reasons outlined below, the Government moves, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

    On October 19, 2009, Khan pleaded guilty to Counts One through Three of the above-captioned Information, pursuant to a cooperation agreement. Count One of the Information charged Khan with conspiring with other individuals to commit securities fraud, in violation of Title 18 United States Code, Section 371, in connection with a scheme to engage in insider trading in the securities of various publicly held companies, from in or about 2004 through in or about November 2007. This charge carries a maximum sentence of five years' imprisonment, a maximum term of three years' supervised release, a maximum fine, pursuant to Title 18, United States Code § 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other

The Honorable Jed S. Rakoff
January 24, 2013
Page 2

than the defendant as a result of the offense, and a mandatory $100 special assessment.

Count Two of the Information charged Khan with a substantive securities fraud offense relating to her trading on the basis of material nonpublic information ("MNPI"), which she obtained from a co-conspirator who worked at a ratings agency. Specifically, Count Two charged Khan with engaging in securities fraud, in violation of Title 15 United States Code, Sections 78j(b) and 78ff, in connection with a scheme to engage in insider trading in the securities of Hilton Corporation ("Hilton"), in or about July 2007. This charge carries a maximum sentence of twenty years' imprisonment, a maximum term of three years' supervised release, a maximum fine, pursuant to Title 18, United States Code § 3571, of the greatest of $5,000,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense, and a mandatory $100 special assessment.

Count Three of the Information charged Khan with obstruction of justice, in violation of Title 18, United States Code, Sections 1505 and 2, in connection with Khan's conduct in deleting an incriminating email sent to her by a co-conspirator while she was cooperating, and advising other co-conspirators about a pending investigation by the Securities and Exchange Commission ("SEC"). This count carries a maximum sentence of five years' imprisonment, a maximum term of three years' supervised release, a maximum fine, pursuant to Title 18, United States Code § 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense, and a mandatory $100 special assessment.

As explained below, Khan has provided substantial assistance to the Government in various insider trading investigations. Khan's timely and early cooperation - before she was offered a cooperation agreement - helped lead to the March 2008 wiretap of the cellular phone used by Raj Rajaratnam, the owner and portfolio manager of the Galleon Group. Khan's

The Honorable Jed S. Rakoff
January 24, 2013
Page 3

cooperation was one of several significant factors that enabled the Government to get authorization to intercept communications over this cellular phone. This wiretap, in turn, yielded incriminating evidence against Rajaratnam and his co-conspirators. Some of these intercepted communications were introduced into evidence at Rajaratnam's trial, see *United States v. Raj Rajaratnam*, 09 Cr. 1184 (RJH), and were powerful evidence that helped lead to his conviction. In addition, this wiretap helped lead to other wiretaps, which in turn have led to numerous insider trading convictions.

Nonetheless, despite Khan's early and timely cooperation against Rajaratnam, Khan rendered herself substantially less useful as a cooperating witness for several reasons. During multiple proffers, Khan was neither completely forthcoming nor truthful with the Government about the extent of her past criminal activities and those of others. What is more, she also engaged in conduct that obstructed the Government's investigation into her and her co-conspirators, and she lied under oath during the course of a civil deposition in connection with a lawsuit that her housekeeper filed against her. In short, Khan's misconduct while cooperating negatively impacted the Government's ongoing investigations.

Ultimately, Khan fully acknowledged her illegal activities and those of others. Khan has continued to provide information about her co-conspirators and assist with various insider trading investigations. In addition, Khan testified as a key cooperating witness against Doug Whitman in *United States v. Whitman*, 12 Cr. 125 (JSR), in August 2012, which trial resulted in the conviction of Whitman of all counts, three of which directly related to Khan's dealings with Whitman. As evidenced by Khan's testimony in that case before this Court, Khan acknowledged and admitted her extensive wrongdoing, and did not minimize her own culpability or overstate that of others.

Accordingly, the Government intends to file a motion at sentencing pursuant to section 5K1.1 of the Guidelines, given Khan's substantial assistance.

I. **Khan's Background**

Khan was born and raised in Delhi, India, where she received a Master's degree in Physics. Khan traveled to the United States around 1982. She attended Kent State University and obtained an advanced degree in Physics. Khan then moved to New York and received a degree in electrical engineering from Columbia University in 1985. Khan later moved to California, where she had a number of jobs in engineering, consulting, and marketing. In the early 1990s, Khan obtained a Masters in Business Administration from the University of California at Berkeley.

Around 1995, Khan joined Intel Corporation ("Intel"), where she worked in marketing. Khan stayed at Intel for about three years (until 1998). Shortly afterwards, Khan took a job with the California satellite office of the Galleon Group ("Galleon"), a multi-billion dollar hedge fund founded by Raj Rajaratnam with headquarters located in Manhattan. After about a year, Khan left Galleon because she was told that she could not keep her personal trading account, which, at the time, had yielded Khan millions of dollars in profits. After Galleon, Khan continued to trade securities in her own accounts, earning millions of dollars until the technology bust around 2002. Around 2005, due in part to Khan losing a lot of money in the stock market, she took a job as a consultant to Trivium, a billion dollar hedge fund based in New York. Khan served in this capacity until even after she began cooperating with the Government in November 2007.

II. **Khan's Prior 2002 Wire Fraud Conviction and Cooperation**

Khan has one prior wire fraud conviction relating to Khan's actions in obtaining MNPI through her job duties at Intel, and providing it to Raj Rajaratnam.

Khan met Rajaratnam shortly after Khan started at Intel. Rajaratnam was an analyst at Needham and offered Khan a job, which Khan turned down because she did not want to move to New York. When Rajaratnam later started Galleon, Khan – who was disenchanted with Intel and wanted to work on Wall Street –

began providing Rajaratnam with Intel MNPI, specifically Intel's book-to-bill information for Intel's top 20 customers. The FBI in San Francisco approached Khan in 1999. After initially denying wrongdoing, Khan later pled guilty to one count of wire fraud pursuant to a cooperation agreement with the U.S. Attorney's Office for the Northern District of California.

In July 2002, Khan was sentenced. Khan received a 5K1.1 letter in connection with her sentencing based on assistance Khan provided during meetings she had with prosecutors, law enforcement, and regulators. Khan was sentenced to three years' probation (with six months' home confinement) for this offense, and was ordered to pay a $30,000 fine and $120,000 in restitution.

### III. Khan's Charged Criminal Conduct Regarding Insider Trading

Khan's criminal conduct in the instant offense commenced in or about 2004. Around this time, Khan was having financial difficulties. Because of this pressure, Khan began soliciting MNPI from various acquaintances and trading on it. In addition, Khan exchanged the MNPI she obtained from her sources with other contacts, who in turn provided Khan with additional MNPI. Khan engaged in this conduct until late 2007 when she was approached by special agents with the FBI in New York.

During this period, Khan's three primary sources for MNPI were: (1) Deep Shah, an analyst at Moody's Corp. ("Moody's"); (2) Sunil Bhalla, a Senior Vice President at Polycom and head of Polycom's Voice Division; and (3) Shammara Hussein, who worked at Market Street Partners ("MSP"), an investor relations firm for various clients, including Google, Inc. ("Google").

Khan met Deep Shah, the Moody's analyst, through Khan's cousin, in or about mid-2006. Thereafter, Shah provided Khan with MNPI on various publicly-traded companies, in exchange for money from Khan. For example, Shah provided Khan with information about an upcoming acquisition of Kronos, Inc., around March 2007. Khan traded on this information and profited over $30,000. Shah also told Khan about an impending

The Honorable Jed S. Rakoff
January 24, 2013
Page 6

acquisition of Hilton Hotels, which Khan traded on and profited more than $600,000.

Khan provided Shah's information to other individuals as well, so that they could trade on it. These individuals included Rajaratnam and Doug Whitman. As Khan explained during the Whitman trial, her "habit" was to share MNPI with certain of her acquaintances, including Rajaratnam; Khan's boss at Trivium and a portfolio manager at Trivium; and Tom Hardin (an employee at Lanexa Management, a New York-based hedge fund). From Shah's information on Hilton, Rajaratnam/Galleon profited more than $4 million, and Trivium more than $5 million.

Khan also obtained Polycom MNPI from her friend, Sunil Bhalla. Khan met Bhalla around 2002, became friends with him, and eventually started getting Polycom MNPI from him on various occasions, ranging from approximately 2004 to 2007. Like Shah's information, Khan passed Bhalla's MNPI on to others, including Whitman, and personally traded on it in January 2006. Khan testified about this at Whitman's trial. Among other things, Khan described how, during conversations from late December 2005 until Polycom's earnings announcement on January 25, 2006, Bhalla advised Khan that Polycom would beat analysts' earnings expectations and would raise guidance for the following quarter. Khan traded on this information and profited more than $300,000. Khan provided this information to Whitman and Rajaratnam, among others. The Polycom MNPI Khan passed to these individuals yielded profits of over $2 million dollars in total.

Khan also received MNPI on Google in July 2007 from Shammara Hussein, a woman Khan befriended who, in 2007, began working for MSP, the private firm to which Google outsourced its investor relations function. Starting around June, Hussein told Khan that for its second quarter of 2007, Google would miss its revenue and earnings per share ("EPS") projections. Khan and Hussein continued to communicate about Google's upcoming announcement and Khan provided Hussein with a cellular telephone over which they could communicate without fear of being monitored or traced. Just before Google's announcement, Hussein advised Khan that Google would meet revenue expectations but

The Honorable Jed S. Rakoff
January 24, 2013
Page 7

miss EPS expectations. This information proved accurate. On July 19, 2007, Google announced its earnings and missed analysts' projected EPS. Its stock price plummeted the next day. Khan had traded on this information and profited more than $500,000. Khan had also shared this Google MNPI with others, including Rajaratnam, whose trades yielded over $8 million, and Whitman, whose firm profited almost $600,000 by trading on this information. Trivium's trades on this information (which had been provided by Khan) netted over $2 million. In exchange for this MNPI, Hussein demanded money from Khan. Tom Hardin ultimately provided Khan with $15,000 to be delivered to Hussein, which Khan never provided as Hussein ceased communicating with her.

In exchange for the MNPI Khan provided to certain of her contacts, Khan received MNPI on various publicly-traded companies. Regarding Trivium, Khan was compensated for her services. In total, Khan personally profited approximately $1,525,000 based on her trades in Polycom, Google, Hilton, and Kronos. Her direct tippees profited approximately more than $25 million from this information.[1]

IV. Khan's Cooperation

Khan was approached by the FBI on November 28, 2007. When she was approached, Khan was not truthful and denied various aspects of her own conduct and the conduct of others. Shortly thereafter, Khan retained counsel and began proffering with this Office. Khan proffered about sources who provided her with MNPI about publicly-traded companies, about her trades based on that MNPI, and her sharing of that MNPI with others. As referenced above, Khan's sources have included insiders at publicly traded companies, and her primary "tippees" included: (1) Raj Rajaratnam, who was convicted after trial of various securities fraud offenses before Judge Holwell in May 2011 and sentenced to

---

[1] Accordingly, for Guidelines purposes, we have calculated Khan's base offense level (8) to be increased by 22 levels, given that the gain to Khan and her tippees was between $20 and $50 million. See U.S.S.G. § 2B1.1(b)(1)(L).

The Honorable Jed S. Rakoff
January 24, 2013
Page 8

11 years' imprisonment; and (2) Doug Whitman, who was convicted after trial of various securities fraud offenses before Your Honor in August 2012 and will be sentenced on January 24, 2013.

As explained below, Khan's cooperation has been extremely valuable to the Government. Khan provided information that helped lead to court-authorized wiretaps over telephones that in turn yielded tremendous benefits in various insider trading cases. And, Khan has testified as a cooperating witness at the trial of Doug Whitman. Despite the benefits derived from Khan's cooperation, however, Khan also engaged in a course of conduct that threatened to undermine her cooperation and her value as a cooperating witness.

### A. Khan's Early Proffers, Consensual Recorded Phone Calls, and Resulting Wiretaps

Khan began proffering with this Office in late 2007. From early on, Khan admitted that she had engaged in insider trading, and identified sources of MNPI and people to whom she provided that MNPI. Khan identified Raj Rajaratnam as her primary co-conspirator and tippee, and provided agents with details into how Rajaratnam engaged in these schemes. During these early proffers and throughout her cooperation, Khan spent hours with agents and prosecutors reviewing instant message contacts, email communications, and other records. These proffers helped place key documents in their proper context. Khan's information about Rajaratnam during these early proffers – particularly regarding Google – was extremely helpful to the Government.

Khan was invaluable in assisting the Government in detecting insider trading. Khan patiently walked federal agents and prosecutors through a maze of contacts, communications, and trading records/patterns that are indicative of insider trading. Through Khan's proffers, the Government identified various targets of insider trading investigations, including insiders at publicly traded companies and "tippees."[2]

---

[2] In addition to FBI agents and Southern District of New York prosecutors, representatives from the SEC attended certain of

The Honorable Jed S. Rakoff
January 24, 2013
Page 9

   In addition to proffering about Rajaratnam, Khan made consensually recorded telephone calls with him, beginning in January 2008. During these calls, Rajaratnam made incriminating admissions about insider trading. Among other things, Rajaratnam identified certain inside sources at publicly traded companies and provided Khan with MNPI about a publicly traded company.

   The timing of these recordings was crucial; they occurred within two months of Khan being approached by the FBI, such that there was no reason to suspect Khan was cooperating with law enforcement. Khan continued to place consensually recorded calls to various targets for nearly one year. All told, Khan placed dozens of recorded calls to several targets, all at the direction of the FBI, many of which yielded incriminating information.

   Khan's information about Rajaratnam and her consensually recorded telephone calls with Rajaratnam were two of several significant pieces of evidence that formed the basis of the Government's application seeking court authorization for a wiretap over Rajaratnam's cellular telephone (the "Rajaratnam Cell Phone") in early March 2008. The Government began monitoring Rajaratnam's communications for several months. The wiretap over the Rajaratnam Cell Phone provided an unfiltered view into how Rajaratnam, as well as his co-conspirators, operated. It yielded incriminating evidence against Rajaratnam, which was some of the most compelling proof offered during his April-May 2011 trial.

   In addition, the wiretap over the Rajaratnam Cell Phone intercepted conversations between Rajaratam and certain of Rajaratnam's co-conspirators passing MNPI. These intercepted conversations - which resulted in part from Khan's information -

---

Khan's proffers. The SEC has filed civil actions against various individuals about whom Khan provided information. These include individuals whom this office did not criminally charge, such as Sunil Bhalla and Robert Feinblatt.

The Honorable Jed S. Rakoff
January 24, 2013
Page 10

helped lead to the convictions and guilty pleas of certain of Rajaratnam's co-conspirators, including the following:

- Adam Smith (Galleon Group Portfolio Manager): Pleaded guilty to securities fraud offenses as part a cooperation agreement with the Government. Smith testified as a cooperating witness against Rajaratnam and was principally sentenced to two years' probation by Your Honor on June 26, 2012.

- Anil Kumar (McKinsey & Co. Senior Partner and Director): Pleaded guilty to securities fraud offenses as part a cooperation agreement with the Government. Kumar testified as a cooperating witness against Rajaratnam and against Rajat Gupta at trial. Kumar was principally sentenced to two years' probation on July 19, 2012 by the Honorable Denny Chin.

- Rajat Gupta (McKinsey & Co. Managing Director; Goldman Sachs Group Inc. Director): Convicted after trial before Your Honor on June 15, 2012 of various insider trading counts. Part of the proof against Gupta included telephone communications intercepted over the Rajaratnam Cell Phone. Gupta was principally sentenced to two years' imprisonment by Your Honor on October 24, 2012.

- Rajiv Goel (Intel Executive): Pleaded guilty to securities fraud offenses as part a cooperation agreement with the Government. Goel testified as a cooperating witness against Rajaratnam at trial and was principally sentenced to two years' probation by the Honorable Barbara S. Jones on September 24, 2012.

In addition, the wiretap over the Rajaratnam Cell Phone enabled the Government to obtain wiretaps over additional telephone lines, including phones used by Danielle Chiesi (an employee at New Castle and Rajaratnam's co-defendant for Indictment 09 Cr. 1184 (RJH)) (the "Chiesi Phones"). The wiretaps over the Chiesi Phones led to additional evidence against Rajaratnam and others, which, in turn, helped lead to

The Honorable Jed S. Rakoff
January 24, 2013
Page 11

the guilty pleas of: (1) Danielle Chiesi, who pleaded guilty to securities fraud counts, and was principally sentenced to 30 months' imprisonment by the Honorable Richard J. Holwell on or about July 20, 2011; (2) Robert Moffat, who pleaded guilty to securities fraud counts, and was principally sentenced to 6 months' incarceration by the Honorable Deborah A. Batts on September 14, 2010; (3) Mark Kurland, who pleaded guilty to securities fraud counts, and was principally sentenced to 27 months' incarceration by the Honorable Victor Marrero on May 25, 2010; and (4) Steven Fortuna, who pleaded guilty to securities fraud counts pursuant to a cooperation agreement, and is awaiting sentencing before the Honorable Sidney H. Stein.

The wiretaps over the Rajaratnam Cell Phone and Chiesi Phones also enabled the Government to obtain authorization to intercept additional wiretaps, including those over the telephone lines of Richard Choo-Beng Lee and Ali Far, who managed the hedge fund Spherix Capital LLC in California from approximately 2007 to 2009. [REDACTED] These wiretaps yielded incriminating evidence against Lee and Far, among others; Ali Hariri (an executive at Atheros Communications) was intercepted over these wires and pled guilty to securities fraud counts and was principally sentenced by the Honorable Richard J. Holwell to 18 months' imprisonment on November 8, 2010.

Both Lee and Far subsequently pleaded guilty to securities fraud-related counts pursuant to cooperation agreements and have been assisting with various securities fraud investigations.

### B. Khan's Additional Proactive Cooperation

In addition to placing consensually recorded calls to Rajaratnam, Khan placed calls to several other individuals, including Doug Whitman (summarized below), and attempted to place calls with several other targets. Khan's consensually recorded calls yielded incriminating statements, which corroborated Khan's proffer statements and courtroom testimony.

In addition to communicating proactively with her past conspirators by telephone, Khan also communicated with them by email and instant message, which developed additional evidence against them.

### C. Khan's Obstruction While She Was Proffering

Khan's historical and proactive cooperation substantially assisted the Government's investigation into insider trading. Yet Khan also engaged in obstructive conduct that threatened to jeopardize the benefits derived from her cooperation. Khan's obstructive conduct consisted of the following actions.

*First*, for considerable time during proffers, Khan was not wholly truthful with FBI agents and prosecutors about the extent of her criminal conduct and that of others. While Khan provided certain information about her criminal activities, Khan was also trying to protect herself and certain conspirators. Accordingly, Khan minimized and omitted the full involvement of certain co-conspirators. Put bluntly, Khan lied to FBI agents and federal prosecutors on multiple occasions about the extent of her and her co-conspirators' conduct, which spanned well into the proffer process.

In early proffers, for example, Khan denied that her trade in Hilton was based on MNPI, and accordingly failed to identify Deep Shah as the source of this MNPI or any of the tippees to whom she provided this MNPI. Rather, as to Hilton, Khan lied about why she had traded. Khan minimized her involvement in the Hilton deal in part to protect her cousin, who had introduced Khan to Shah and who provided Shah with money (from Khan) for the Hilton tip. Ultimately, months later, Khan acknowledged this trade was based on MNPI from Shah and outlined her arrangement with Shah.

Similarly, Khan did not provide complete information about several of her tippees for an extended period of time. At certain points, Khan acknowledged to agents and prosecutors that she provided these tippees with MNPI, but Khan at times minimized what exactly she told those tippees about the MNPI, or

The Honorable Jed S. Rakoff
January 24, 2013
Page 13

omitted key facts regarding her dealings with them. In the case of Tom Hardin, for example, it was not until almost a year into proffering that Khan acknowledged Hardin paid money to Shah for MNPI, or that he provided Khan with money in connection with the July 2007 Google trade. Khan did this for a number of reasons, including the desire to protect others and herself.

*Second*, while Khan was proactively cooperating, she alerted certain co-conspirators that the SEC had contacted her and asked her questions about certain of her trades. Khan did this so as to prevent certain of her co-conspirators (such as Hardin and Shah) from sending her incriminating information, which would then get those individuals in trouble and make clear that Khan herself had been lying and omitting facts about her own insider trading and about the full extent of her co-conspirators' actions. In the case of Deep Shah, for example, Khan communicated with him shortly after first meeting with the FBI, while Shah was in India, and advised him about the SEC speaking with her. Khan also discussed a cover story they could use to explain their dealings in Hilton and Kronos. While the ramifications of these actions on the Government's insider trading investigations is difficult to assess, one target - Deep Shah (who was criminal charged) - has not, to the Government's knowledge, returned to the United States.

*Third*, and related to the above, while Khan was cooperating proactively, Khan continued to communicate with certain of her co-conspirators without the permission of the FBI. Khan directed her gardener to purchase a cellular telephone in his name, which Khan then used to covertly communicate with some of her co-conspirators for approximately four months starting in early 2008. Again, Khan maintains that she did this because of her concern that these individuals would send Khan incriminating information, which could inculpate them and which could show that Khan had been minimizing her own involvement in insider trading. Khan did not volunteer this information to the FBI until she was confronted about it.

*Fourth*, after Khan was approached by the FBI in late 2007, she deleted email communications from her computers out of fear

The Honorable Jed S. Rakoff
January 24, 2013
Page 14

that these emails would expose illegal conduct that she had not disclosed.  Khan also deleted an incriminating e-mail that one of her co-conspirators sent to her around April 2008 relating to Polycom; Khan deleted this latter email during the time period that she was proffering.

### D. Khan's Perjury and Obstruction in an Unrelated Civil Litigation

While cooperating, Khan also committed perjury and engaged in obstructive conduct relating to the case *Serralta* v. *Khan*, 08 Civ. 1427-CW, a civil case that was filed against Khan in March 2008 in the United States District Court for the Northern District of California.  Khan's former housekeeper sued Khan, principally alleging that Khan failed to pay the housekeeper the wages to which she was entitled.  During this litigation, Khan directed another one of her employees, specifically Khan's assistant, to falsify and create a document.  The document purported to outline an employment agreement between Khan and the housekeeper, which specified the hours the housekeeper would work.  Khan's assistant also forged the housekeeper's signature on the document.  This bore upon one of the central issues in the litigation – the scope of the housekeeper's duties and agreed-upon hours of employment.  Khan presented this document to the Court and plaintiff's counsel through her attorneys, representing that this agreement was in effect during the housekeeper's employment, when in fact it was not.

Throughout the litigation, Khan repeatedly lied about this document, including during a sworn deposition she gave for the case in April 2009, as well as in declarations to the court handling the civil case.  Again, put bluntly, Khan's lies regarding this document were extensive; they related to the document's creation, authenticity, and origination.  Ultimately, this lawsuit was settled around mid-September 2009.  Khan did not tell the FBI or the Government that she had perjured herself prior to the Government's learning about it on its own, after Khan had signed her cooperation agreement and pleaded guilty pursuant to that agreement.  As with Khan's other obstructive conduct, the impact of her conduct in the *Serralta* litigation on

the Government's investigation is difficult to assess. This conduct impacted Khan's utility as a witness given her willingness to perjure herself.

Taken in its entirety, Khan's obstructive conduct has been a factor in the Government's decision as to whether to pursue certain criminal charges.

### E. Khan's Utility in <u>United States</u> v. <u>Raj Rajaratnam</u>

Based in part on Khan's information, a criminal complaint against Raj Rajaratnam was obtained on October 14, 2009 in the United States District Court for the Southern District of New York, and Rajaratnam was arrested on October 16, 2009. Khan's interactions with Rajaratnam formed a basis for one of the 14 counts against Rajaratnam listed in the second superseding Indictment.

Khan was not called as a witness to testify at the trial of Raj Rajaratnam. The Government produced 3500 material for Khan to Rajaratnam's attorneys, and also made her available as a defense witness. Despite not calling Khan to testify, the Government proved the count that related to Khan – which focused on Rajaratnam's trades in Polycom, Hilton, and Google – through a variety of documentary evidence and witness testimony. Some of the documents supporting Rajaratnam's conviction on this count were obtained through Khan's information. Based on Khan's proffers, for example, the FBI and the Government learned of various business records to request, as well as other investigative avenues to pursue. Khan thus helped lead the Government to evidence it was able to obtain and introduce at Rajaratnam's trial.

### F. Khan's Testimony at <u>United States</u> v. <u>Doug Whitman</u>

The Government called Khan to testify as one of its principal cooperating witnesses at the August 2012 trial of Doug Whitman, the portfolio manager and founder of Whitman Capital, Inc. Khan's testimony directly related to three of the four counts with which Whitman had been charged: (1) Count Two

(conspiracy to commit insider trading); (2) Count Three (insider trading relating to Whitman's January 2006 trades in Polycom); and (3) Count Four (insider trading relating to Whitman's July 2007 trades in Google). The Government corroborated Khan's testimony with substantial other evidence. The Government relied in part on Khan's testimony about her interactions with Whitman, among other types of evidence, to help prove Whitman's criminal intent. The Government also needed Khan's testimony to help establish the nature and source of the Inside Information Khan obtained from Sunil Bhalla and Shammara Hussein.

Khan spent dozens of hours with Government prosecutors and FBI agents preparing for trial. As part of this trial preparation, Khan listened to consensual recordings between herself and Doug Whitman, reviewed transcripts of those recordings for accuracy, and examined email communications. Khan made multiple airplane trips from her home to New York for these purposes, requiring her to be away from home and her young child.

Khan testified at Whitman's trial about obtaining Polycom MNPI from Bhalla. While Khan did not recall all the specific details of her conversations with Whitman about Polycom, she testified that she provided Whitman with the Polycom MNPI she received from Bhalla (including for the fourth quarter of 2005, which formed the basis of Count 3 of the Indictment). Khan also explained that Whitman would "hound" her to get MNPI from Bhalla about Polycom. As with other areas of her testimony, Khan did not attempt to minimize or overstate her interactions with Whitman.

Khan's testimony about Polycom was corroborated by extremely explicit consensually recorded calls she placed to Whitman in 2008 at the direction of the FBI, which proved to be devastating evidence. Khan's testimony was corroborated by other evidence, including: (1) phone records showing contacts between Khan and Whitman in January 2006; and (2) Whitman's trading records, which showed that he profited over $300,000 from Khan's Polycom MNPI.

	Khan also testified about providing Whitman with the Google MNPI she received from Hussein.  As with Polycom, Khan did not recall all the specific details of all of her conversations with Whitman, but she testified that she passed along the Google MNPI to Whitman the same day (or shortly after) Khan received it from Hussein.  This testimony was corroborated by substantial other evidence as well, including: (1) phone records showing contacts between Khan and Whitman in the days leading up to Whitman's trade, including the day before he traded; (2) Whitman's trading records, which showed that he profited almost $600,000 from Khan's MNPI; (3) a 2008 consensually recorded telephone call between Khan and Whitman, in which Whitman referred to Khan as "Miss Google"; (4) an email Whitman sent to Khan the evening of July 19, 2007 (after Google's announcement); and (5) a receipt for flowers that Whitman sent to Khan the day after his Google trade, which bore the message "thank you from Whitman Capital."

	Khan's testimony about Google was also corroborated by a December 2008 wiretapped telephone call between Wes Wang and Doug Whitman, in which Wang asked Whitman if he "did" Google, to which Whitman responded that he did "for awhile," adding that "Roomy had a mole there for awhile."  Whitman then went on to explain in great detail how Roomy had "lost the mole," because "the woman wanted her to take care of her for . . . giving her the information."

	As is the case with many cooperating witnesses, Khan was subjected to rigorous cross examination.  Given Khan's serious misconduct during the time she was cooperating with the FBI, the defense had abundant material with which to cross-examine Khan.  The defense used this material to attack Khan's credibility; indeed counsel cross-examined her for almost an entire day.  On cross examination, Khan repeatedly and without hesitation acknowledged engaging in serious misconduct, before and during the time she was proffering.

	While the jury's having credited Khan's testimony may largely have been influenced by the various pieces of evidence that corroborated Khan's testimony, the Government believes it also is due to Khan's demeanor as a witness – she came across as

The Honorable Jed S. Rakoff
January 24, 2013
Page 18

candid, as someone who accepted responsibility for her past actions, who did not minimize her own guilt, nor overstate the culpability of others.

### G. Khan's Cooperation In Other Matters

Khan has substantially assisted the Government's efforts in detecting insider trading.  She has continued to speak with the FBI about certain investigations, and, more generally, to help with detecting trading patterns or trends.  Her cooperation is ongoing.  ███████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

Accordingly, the Government requests that Khan's continued cooperation be a condition of any sentence the Court imposes.

The Honorable Jed S. Rakoff
January 24, 2013
Page 19

### V. Conclusion

Khan's cooperation with the Government, while limited by her failure to be fully truthful and her efforts to protect others, has nonetheless been extremely substantial, as evidenced by the successful wiretaps of Rajaratnam and others; and the convictions of the many individuals referenced in this letter, including Rajaratnam and Whitman. Accordingly, the Government requests that this Court sentence Khan in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines.[3]

                Respectfully submitted,

                PREET BHARARA
                United States Attorney

      By:   /s/ Christopher L. LaVigne
                Christopher L. LaVigne
                Jillian B. Berman
                Assistant United States Attorneys
                Tel.: (212) 637-2325/2197

cc:  U.S. Probation Officer Kisha Singleton (via email)
     Stan German, Esq. (via email)